WILLIAM R. HUNTLEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MANUFACTURERS & TRADERS TRUST COMPANY AND WILLIAM R. HUNTLEY, TRUSTEES FOR MARY HUNTLEY GREEN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MANUFACTURERS & TRADERS TRUST COMPANY AND WILLIAM R. HUNTLEY, TRUSTEES FOR ROBERT R. HUNTLEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 69214, 69215, 69216.   Promulgated June 15, 1934.

*Ralph M. Andrews, Esq.*, for the petitioners.
*George D. Brabson, Esq.*, for the respondent.

#### OPINION.

TRAMMELL: These are consolidated proceedings for the redetermination of deficiencies in income tax for the year 1930 as follows:

| Docket No. | Petitioner | Deficiency |
| --- | --- | --- |
| 69214 | Manufacturers & Traders Trust Co. and William R. Huntley, trustees for Mary Huntley Green | $2,765.59 |
| 69215 | Manufacturers & Traders Trust Co. and William R. Huntley, trustees for Robert R. Huntley | 1,289.75 |
| 69216 | William R. Huntley | 6,522.52 |

The sole issue in this case relates to the basic date for determination of the profit derived by the petitioners from the sales of certain corporate stocks during the year 1930. The facts were stipulated by the parties, and their stipulation is by reference here adopted in full as our findings of fact. Only so much of the stipulation as is deemed essential to a discussion of the issue is set out hereinbelow.

Charles R. Huntley died testate, a resident of the city of Buffalo, Erie County, New York, on September 27, 1926. The petitioners in Docket Nos. 69214 and 69215 are the duly qualified trustees under the last will and testament of the decedent, and the petitioner in Docket No. 69216 is a son of the decedent.

On May 22, 1929, the Surrogate of Erie County, New York, issued a decree judicially settling the intermediate accounts of the executors

of the decedent's estate, and ordering a partial distribution of the assets. The decree in material part reads as follows:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that said Executors make a partial distribution of the securities and property remaining in their hands and transfer and deliver the same as follows:

To WILLIAM R. HUNTLEY

\* \* \* \* \* \* \*

500 Shs. Amer. Superpower Corp. Class B. Com_____ $48,000.00

\* \* \* \* \* \* \*

To WILLIAM R. HUNTLEY AND MANUFACTURERS & TRADERS-PEOPLES TRUST COMPANY, AS TRUSTEES FOR ROBERT R. HUNTLEY

\* \* \* \* \* \* \*

1250 Shs. Bflo. Niag. & East. Pr. Corp. Class A_____ 79,843.75

\* \* \* \* \* \* \*

To WILLIAM R. HUNTLEY AND MANUFACTURERS & TRADERS-PEOPLES TRUST COMPANY, AS TRUSTEES FOR MARY HUNTLEY GREEN

\* \* \* \* \* \* \*

1250 Shs. Bflo. Niag. & East. Pr. Corp. Class A_____ 79,843.75

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the proper officers, registrars and transfer agents of the respective corporations by whom said stocks and bonds were issued be and they hereby are directed upon the presentation to them of the stock certificates and/or bonds duly endorsed and a duly certified copy of this decree to make transfer of the stock represented by said certificates and of said bonds as hereinabove directed;

\* \* \* \* \* \* \*

IT IS FURTHER ORDERED, ADJUDGED AND DECREED UPON filing in this Court receipts showing the distribution, transfer and delivery of the moneys and property as hereinabove directed, that the executors be and they hereby are discharged of any further liability and accountability as to all things determined by this decree;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that after making the payments and transfers hereinabove directed to be made, the balance of the moneys and property in their hands be retained by the Executors and administered in accordance with the terms of the Last Will and Testament of Charles R. Huntley, Deceased.

Pursuant to the surrogate's decree the executors proceeded to have the securities transferred on the books of the respective corporations to, and new stock certificates issued in the names of, the several legatees entitled to receive them.

Thereafter, on June 20, 1929, the executors delivered to the trustee for Robert R. Huntley a certificate for 1,250 shares of class A stock of the Buffalo, Niagara & Eastern Power Corporation, which certificate was, on August 19, 1929, exchanged by the trustees for 5,000 shares of common stock of Niagara Hudson Power Corporation. The latter stock was sold by the trustees on May 12, 1930.

On June 20, 1929, the executors also delivered to the trustees for Mary Huntley Green a certificate for 1,250 shares of class A stock of the Buffalo, Niagara & Eastern Power Corporation, which certifi-

cate was, on August 19, 1929, exchanged by the trustee for 5,000 shares of Niagara Hudson Power Corporation common stock, and the latter stock was sold by the trustees on May 12, 1930.

On July 12, 1929, the executors delivered to petitioner William R. Huntley a certificate for 2,500 shares of the new common stock of the American Superpower Corporation, which certificate had been received by the executors on June 14, 1929, in exchange for the original 500 shares of class B common stock of this corporation, referred to in the decree of distribution. William R. Huntley sold the 2,500 shares of new common stock on October 14, 1930.

The class A stock of the Buffalo, Niagara & Eastern Power Corporation had a fair market value of 61½ on May 22, 1929, and the same stock had a fair market value of 99⅜ on June 20, 1929. The class B common stock of the American Superpower Corporation had a fair market value on May 22, 1929, of 163⅝, and the new common stock of this corporation had a fair market value on June 14, 1929, of 41⅛ and on July 12, 1929, of 64¼.

In determining the deficiencies in controversy, respondent used as the basis for computing the profit derived by the petitioners from the sales of stock in 1930 the fair market value of the stocks on the date of the decree of distribution, while the petitioners contend that the proper basis is the fair market value at the dates on which the stock certificates were actually delivered to them by the executors.

The pertinent provisions of the Revenue Act of 1928, embodied in section 113 (a) (5), are set out in the margin.[1]

Under the prior acts the basis for computing gain or loss on the sale of corporate securities received from a decedent was the fair market value of such property "at the time of acquisition." The 1928 Act effected a change in the law and provided that the basis for determining gain or loss upon the sale of personal property acquired by general bequest, as in the present case, shall be the fair market value of the property "at the time of the distribution to the taxpayer." *Brewster* v. *Gage*, 280 U.S. 327.

The parties here agree that the basis for determining the gain derived from the sales of stocks in 1930 is the fair market value "at

[1] SEC. 113. BASIS FOR DETERMINING GAIN OR LOSS.

(a) *Property Acquired After February 28, 1913.*—The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913 shall be the cost of such property; except that—

\*          \*          \*          \*          \*          \*          \*

(5) PROPERTY TRANSMITTED AT DEATH.—If personal property was acquired by specific bequest, or if real property was acquired by general or specific device or by intestacy, the basis shall be the fair market value of the property at the time of the death of the decedent. If the property was acquired by the decedent's estate from the decedent, the basis in the hands of the estate shall be the fair market value of the property at the time of the death of the decedent. In all other cases if the property was acquired either by will or intestacy, the basis shall be the fair market value of the property at the time of the distribution to the taxpayer. \* \* \*

the time of the distribution " to them, but they disagree as to what date or dates constitute " the time of the distribution." Thus, the issue presented involves a construction of the phrase " time of the distribution to the taxpayer." In other words, under the facts of this case, when were the stocks in question distributed to the petitioners within the meaning of the statute? Was " the time of the distribution " the date on which the surrogate by his decree ordered distribution to be made, as urged by the respondent, or the dates on which the stock certificates were actually delivered to the respective distributees by the executors, as contended by the petitioners?

Substantially the same question was considered by us in *Arthur E. Braun, Trustee*, 29 B.T.A. 1161. In that case the Orphans' Court entered a decree in 1925 and another in 1927, in each of which it was directed that certain shares of stock be distributed to the trustees at a future date. The certificates of stock were not actually delivered to the distributees until subsequent to the dates on which distribution was ordered by the decrees. Two lots of stock were sold in 1928. We held in that situation that " the time of the distribution to the taxpayer ", under the statute hereinabove referred to, was. neither the dates on which the decrees were entered nor the dates on which the stock certificates were actually delivered to the distributees, but the effective dates of the decrees, that is, the dates on which distribution was directed to be made by the decrees. In our opinion we said:

As we construe these decrees, they directed in effect that distribution be made at a future date, upon the happening of specified events, and until those events transpired, the decrees by their terms were not operative to effect distribution. * * *

The dates on which the executors in this case delivered actual possession of the stock to the trustees, we think, are immaterial. The dates on which the decrees directed distribution constituted the " time of the distribution to the taxpayer" within the meaning of section 113 (a)(5), *supra*, and the fair market value of the stock on those respective dates is the basis provided for determining gain or loss.

The same rule, in our opinion, must be applied in the instant case. Here the surrogate's decree did not direct distribution to be made at a future date, but the executors were ordered to make distribution without limitation as to time, and hence they were authorized to distribute immediately after the signing and entry of the decree. The effective date of the decree was, therefore, May 22, 1929. On and after that date the respective petitioners were the owners of the shares of stock set aside and distributed to them by the decree. Any increase in the value of the stocks thereafter would inure exclusively to their benefit, and they alone would suffer loss resulting from any decline in the value after that date.

A certificate of stock merely evidences ownership, it is not the stock itself. If certificates representing the shares of stock distributed to these petitioners had never been delivered to them by the executors, they would nevertheless have been the owners of interests in the respective corporations from May 22, 1929. Therefore, the dates on which the stock certificates were actually delivered to the petitioners are not the dates on which they became the owners of the property or interest rights in the corporations; they became owners of such property rights on the effective date of the decree of distribution, namely, May 22, 1929.

Plainly, we think, to adopt the contention of the petitioners that " the time of the distribution " is the date on which actual delivery is made would throw open the door to tax evasion and lead to results not contemplated by Congress in adopting the statute in question. In such event, any taxpayer in the position of these petitioners could obtain an increased basis for computing profit or loss by merely deferring acceptance of possession of the stock certificates on a rising market where the value of the stock was increasing.

This is well illustrated by the instant case. The surrogate's decree of May 22, 1929, directed distribution to petitioner Huntley of 500 shares of class B common stock of the American Superpower Corporation, then having a fair market value of 163⅝. On June 14 the executors received a certificate for 2,500 shares of the new common stock, made out in Huntley's name, in exchange for the original 500 shares of class B common. Yet the certificate for the new stock was not delivered to the petitioner until July 12, 1929. The market price of the stock was increasing rapidly. The new stock had a fair market value of 41⅛ on June 14, but its value had increased to 64¼ on July 12, when actual delivery of the certificate was made, thus affording the petitioner a materially increased basis for computing profit on a subsequent sale, if value at the date of actual delivery of the certificate be taken as a basis.

We do not think that Congress intended by the quoted statute to permit a taxpayer to fix the basis for determining profit or loss by merely accepting possession immediately in the case of a falling market or deferring acceptance of the stock certificates where the market is rising.

On authority of our decision in the *Braun* case, *supra*, we hold that the basis for determining gain or loss on the sales of the stocks here involved is the fair market value of the stocks at May 22, 1929, the effective date of the decree of distribution.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

SMITH, dissenting: That the phrase " at the time of the distribution to the taxpayer " used in section 113 (a) (5) of the Revenue Act of 1928 has the meaning " at the time of the delivery to the taxpayer " appears to me to admit of no doubt. The Senate Finance Committee Report No. 960, p. 28, 70th Cong., 1st sess., explaining section 113 (a) (5), states:

It appears that the House bill is inadequate to take care of a number of situations which frequently arise. For example, the executor, pursuant to the terms of the will, may purchase property and distribute it to the beneficiaries, in which case it is impossible to use the value at the decedent's death as the basis for determining subsequent gain or loss, for the decedent never owned the property. Moreover, the fair market value of the property at the decedent's death can not properly be used as the basis, in the case of property transferred in contemplation of death where the donee sells the property while the donor is living.

Accordingly, the committee has revised section 113 (a) (5) and certain related sections, so as to provide that in the case of a specific bequest of personalty or a general specific devise of realty, or the transmission of realty by intestacy, the basis shall be the fair market value at the time of the death of the decedent. In these cases it may be said, as a matter of substance, that the property for all practical purposes vests in the beneficiary immediately upon the decedent's death, and therefore the value at the date of death is a proper basis for the determination of gain or loss to the beneficiary. The same rule is applied to real and personal property transmitted by the decedent, where the sale is made by the executor. In all other cases the basis is the fair market value of the property at the time of the distribution to the taxpayer. The latter rule would obtain, for example, in the case of personal property not transmitted to the beneficiary by specific bequest, but by general bequest or by intestacy. It would also apply in cases where the executor purchases property and distributes it to the beneficiary.

It must be apparent from the foregoing that in many instances the phrase " time of distribution " has application to the time of delivery. Why should not the rule be applied universally? I think it should be. I am furthermore of the opinion that the Committee, in referring to the case " where the executor purchases property and distributes it to the beneficiary," must have had in mind an act which the executors have the power to perform. That is delivery—not apportionment.

It is furthermore to be noted that elsewhere in the Revenue Act of 1928 the word " distribution " or " distribute " is used, notably in sections 112, 115, 161, 162, and 182. In all of these sections the word has reference to payment or delivery. But, even more significantly, the word appears in section 113 (a) (9), the same section of the law involved here. In every instance where the word appears in these sections it is used synonymously with " delivery." Indeed, in section 113 (a) (9), Congress has used the word " distribution " in clear contradistinction to the word " apportioned."

Where Congress had occasion in the Revenue Act of 1928 to refer to income or property which is set aside for specific beneficiaries but not physically transferred to them, it used the phrase " to be   *  *  " distributed as the court may direct " (as in section 161 (a) (2) and section 162 (b)), or referred to such income or property as "distributive share " (as in section 182 (a)).

There is a sharp analogy between distribution of an estate and distribution of dividends. Dividends when declared are formally set aside out of surplus for stockholders, though not paid until a later date. In other words, so much of the corporation's surplus is allotted to stockholders. Yet, in construing the Revenue Act of 1917 (section 31 (b)), dealing with " distribution made to the shareholders " the courts held that " distribution made " meant " paid "— not " declared."

In *Mason* v. *Routzahn*, 275 U.S. 175, the Supreme Court held: " We think it clear that, for this purpose, the date of payment, not the date of the declaration of the dividend, is the date of distribution  * * *." To the same effect is *Lewellyn* v. *Harbison*, 31 Fed. (2d) 740 (certiorari denied, 280 U.S. 560), in which the Circuit Court of Appeals for the Third Circuit held: " We agree with the Circuit Court of Appeals for the Sixth Circuit that a ' distribution made ' means ' dividends paid,' and not merely declared.  * * *"

It is furthermore to be noted that the courts and statutes of New York and of most jurisdictions regard " distribution " as being an act of executors done pursuant to a decree—not an act accomplished by the decree itself. The New York law is plain. The decree pursuant to which the taxpayers here received Buffalo, Niagara & Eastern Power Corporation and American Superpower Corporation stock did not say " the following securities are hereby distributed." It said, " ORDERED, ADJUDGED AND DECREED *that said Executors make a partial distribution* of the securities and property remaining in their hands." (Emphasis supplied.) Had distribution been effected by the decree itself, it would have read, " ORDERED, ADJUDGED AND DECREED that the following securities and property remaining in the hands of the executors be and they are hereby distributed in the following manner." In other words, distribution was not effected by the decree. The decree simply directed the executors to make distribution. This is in line with the New York statute. Section 267 of the Surrogate's Act provides:

Where an account is judicially settled, as prescribed in this article, and any part of the estate or fund remains and is ready to be distributed, *the decree must direct the payment and distribution thereof* to the persons so entitled, according to their respective rights. It may also award to a surviving husband, wife, or child, the same relief as to set off of exempt property which

may be awarded in his or her favor, on a petition presented as prescribed in section two hundred and one of this act. [Emphasis supplied.]

"Payment" and "distribution" are treated synonymously by the statute, payment applying to cash and distribution to property other than cash.

To the same effect are the New York cases. See *Matter of Isaacs*, 103 Misc. 184, 191; *Matter of Thompson*, 41 Misc. 420; *Clapp* v. *Meserole*, 38 Barb. 661.

New York by no means stands alone in regarding the decree as *ordering* the executors to make distribution (thereby denoting delivery) rather than itself effecting distribution. In Michigan, in the case of *Burke's Estate*, 240 Mich. 444; 215 N.W. 413, 417, it was held: "The distribution in the sense that it is used in the statute means a physical turning over of the estate to those who are by law entitled to it." See also *Scully* v. *Squier*, 13 Idaho, 417; 90 Pac. 573; *Goldberg* v. *Kidd*, 5 S.D. 169; 58 N.W. 574.

In *Brewster* v. *Gage*, 280 U.S. 327, the Supreme Court used this language:

Petitioner's father died testate May 20, 1918. The Surrogate's Court at Rochester, N.Y., entered a final decree April 19, 1920, *pursuant to which certain stocks were distributed* to the petitioner as one of the residuary legatees. * * * [Emphasis supplied.]

The use of the word "pursuant" is an absolute negation of the idea that distribution is effected by the decree itself. Webster's Dictionary defines "pursuant" as follows:

(As an adjective) "Acting or done in consequence or in prosecution (of anything); hence, agreeable; conformable, following, according;" and (as an adverb) "Agreeably; conformably; according; as, *pursuant* to our contract."

In *Benjamin G. Chapman, Jr., Executor*, 19 B.T.A. 105, we said:

In view of the pleadings herein and the admissions made by counsel at the hearing, the only controversy between the parties to this proceeding is as to the date that Fannie H. Higbee acquired, within the meaning of the Revenue Acts of 1921 and 1924, the 4,956 shares of the capital stock of the Burroughs Adding Machine Co. that were *distributed* to her on August 7, 1918, *pursuant* to the decree of the Circuit Court of the city of St. Louis.

\* \* \* \* \* \* \*

The petitioner relies on the cases of *F. W. Matthiessen, Jr.*, 2 B.T.A. 921; *Alice Fisher Foster*, 7 B.T.A. 1137; *Nellie B. McGee*, 13 B.T.A. 1181; and *F. W. Matthiessen, Jr.* v. *United States*, 65 Ct. Cls. 484, in which it was held that a legatee under a will acquires personal property within the meaning of the Revenue Acts of 1918 and 1921 when such property is *distributed by the executor* and that gain or loss on the subsequent sale of the property should be computed from the date of distribution. * * * [Emphasis supplied.]

In *F. W. Matthiessen, Jr.* v. *United States*, 65 Ct. Cls. 484, the court said in narrating the facts:

Subsequent to the execution of the above agreement, June 18, 1918, *an order was entered by the probate court authorizing the executors to distribute* to the residuary legatees all of the stocks of the testator, except certain ones with which we have no concern. [Emphasis supplied.]

It is elementary law that under the will of a decedent personal property composing the residuary estate of the decedent passes to the executor. *In re Stoiber*, 103 Misc. 654; 170 N.Y.S. 897; *Anderson* v. *Wilson*, 289 U.S. 20. Title continues in the executor until he transfers it pursuant to the decree. *Anderson* v. *Wilson, supra.* The decree itself does not effect a change in title. It simply evidences a right to receive it. The Supreme Court said in *Brewster* v. *Gage, supra:*

\* \* \* The decree of distribution confers no new right; it merely identifies the property remaining, evidences right of possession in the heirs or legatees, and requires the administrators or executors to deliver it to them. \* \* \*

In the light of the above I can not see any ground for a contention that the " time of distribution " used in section 113 (a) (5) of the statute has reference to any time other than that when actual distribution is made to the legatees. I think it is immaterial whether that distribution is made before or after the date of the decree ordering distribution. It was unquestionably the intent of Congress to lay down a universal rule which a layman could follow. If the " time of distribution " has reference to the date of the decree in this case, and in *Arthur E. Braun*, 29 B.T.A. 1161, to a period after the date that the decree was entered, the administration of the provision in question must be attended with the same uncertainty which obtained prior to the amendment of the law made by the section in question.